Filed 5/9/23 P. v. Casas CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E077953 |
| v. | (Super.Ct.No. FMB21000209) |
| CHRISTOPHER ARELLANO CASAS, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County. Rodney A. Cortez, Judge. Affirmed.

Charles R. Khoury, Jr., by appointment of the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Steve Oetting and Paige B. Hazard, Deputy Attorneys General, for Plaintiff and Respondent.

## I. INTRODUCTION

In May 2021, D.L. and K.S. encountered a man wielding what they believed to be a gun during their stay at a short-term rental property. The man ordered D.L. and K.S. to get on the ground and then proceeded to walk toward the main house located on the property. D.L. and K.S. heard the sound of glass shattering, and it was subsequently discovered that various items of value had been taken from the house.

As a result of this incident, defendant and appellant Christopher Arellano Casas was convicted by a jury of one count of first degree burglary (count 1; Pen. Code, § 459)[1] and two counts of assault with a deadly weapon (counts 2, 3; § 245, subd. (a)(1)). He was also convicted of one count of assaulting a police animal (count 4; § 600, subd. (a)) related to events immediately prior to his arrest. Defendant was sentenced to an aggregate term of eight years in state prison, which included the imposition of the upper term of six years for the burglary (count 1) and consecutive, one-year terms for each assault, representing one-third the middle term for these offenses (counts 2, 3).

In this appeal, defendant argues that (1) his convictions for assault with a deadly weapon (counts 2, 3) must be reversed because there was insufficient evidence to support a finding that he had the present ability to inflict harm during his encounter with D.L. and K.S.; (2) the trial court erred when it referred the jury to prior instructions in response to a jury question requesting a definition of "deadly weapon"; and (3) defendant is entitled to have his sentence vacated and the matter remanded for resentencing as the result of

---

[1] Undesignated statutory references are to the Penal Code.

2

amendments to section 1170 made by Senate Bill No. 567. (Stats. 2021, ch. 731, § 1.3) We conclude that (1) substantial evidence in the record supports defendant's convictions for assault with a deadly weapon; (2) defendant has forfeited his claim of instructional error; and (3) any error under section 1170, subdivision (b), was harmless. As a result, we affirm the judgment.

## II. FACTS & PROCEDURAL HISTORY

A. *Background and Charges*

In May 2021, D.L. and K.S. went on a leisure trip where they planned to stay in a recreational vehicle (RV) located on a short term rental property. After using the pool located on the property, D.L. and K.S. were approached by a man wielding an object that D.L. and K.S. believed to be a firearm. The man ordered D.L. and K.S. to get on the ground, and then he walked toward a main house located on the property. D.L. and K.S. heard the sound of glass shattering. After a period of time, D.L. and K.S. left the property and reported the incident to law enforcement.

It was subsequently discovered that various items of value had been taken from the main house located on the property. Law enforcement officers followed shoe and vehicle tracks on the ground near the property to a shack in the desert, where they eventually encountered defendant the following day. After a pursuit, defendant was eventually taken into custody. Items taken from the main house on the property were recovered from defendant's vehicle, as well as three air rifles and a paintball gun.

As a result of these events, defendant was charged with one count of first degree burglary (count 1; § 459); two counts of assault with a deadly weapon (counts 2, 3; § 245, subd. (a)(1)); and one count of assaulting a police animal (count 4; § 600, subd. (a)).

B. *Relevant Evidence at Trial*[2]

1. Testimony of D.L.

D.L. testified that on May 11, 2021, he and K.S. were staying in an RV located on a short-term rental property. The two had just finished using the pool located on the property when D.L. heard a rustling noise coming from the bushes located along the edge of the property. D.L. saw a man walk up holding "what looked to be like a gun, a rifle-type gun, pointing straight at" D.L. The man as wearing "an army camouflage, tan setup" with a "gaiter over his face, covering his nose."

The man began to yell, ordered D.L. to get on the ground, and D.L. slowly complied. As D.L. was on the ground, K.S. walked out of the RV; the man turned and pointed the gun at K.S. and ordered K.S. to get on the ground. The man then walked toward the main house located on the property. D.L. heard "a bunch of banging or, like, glass shattering." When asked to further describe the sounds, D.L. stated there was "a lot of bang[ing]" and that he could not tell if it was the gun discharging or just smashing something.

---

[2] Because defendant's appeal challenges only the sufficiency of the evidence to support a finding that he had the present ability to harm during his encounter with D.L. and K.S., we summarize only the evidence relevant to this issue.

D.L. was asked to review several exhibits, and he identified photographs of the air rifles recovered from defendant's vehicle as photographs depicting the object the man dressed in camouflage used to threaten D.L.[3]

2. Testimony of K.S.

K.S. testified that on May 11, 2021, D.L. had just finished using the pool located on the short-term rental property. He observed D.L. walk to get a shirt, but then stop and get on the ground. When he asked what D.L. was doing, K.S. heard another man's voice tell him to get on the ground in response. K.S. looked toward the voice and saw a man holding "a large-barrel object." K.S. described the object as "like almost a large-barrel shotgun," which the man was holding "as if it were a gun." K.S. identified a photograph of the air rifles recovered from defendant's vehicle[4] as depicting a gun that was "similar" to the one the man was holding.

K.S. testified that he felt threatened during the encounter and that based upon the man's "erratic behavior," K.S. "thought he was going to shoot" K.S. and D.L. After K.S. complied with the man's instructions and lay on the ground, the man walked toward the main house located on the property. At that point, K.S. heard "tapping at first, then shattering" of glass.

---

[3] Specifically, D.L. identified exhibit Nos. 55 and 56 as the photographs that most matched the "profile" of the gun the man was holding. A sheriff's deputy later testified that exhibit Nos. 55 and 56 depicted air rifles recovered from defendant's vehicle.

[4] Similar to D.L., K.S. identified exhibit No. 55 as the photograph depicting an object similar to the one the camouflaged man was holding.

3. Testimony of Sheriff's Deputy

A San Bernardino County Sheriff's Department deputy testified that he participated in the investigation of a suspicious circumstance reported on May 11, 2021, as well as the subsequent search of defendant's vehicle. According to the deputy, exhibit Nos. 55, 56, and 57 were photographs that depicted some of the items recovered from defendant's vehicle. Specifically, exhibit Nos. 55 and 56 depicted air rifles recovered from the vehicle, while exhibit No. 57 depicted a paintball gun recovered from the vehicle.

The deputy testified that air rifles are used for recreational target shooting, but they are also frequently used for hunting small animals and coyotes. If fired at a living creature, such a rifle could cause "significant injury, up to and including death." Pellets fired from an air rifle "tend to have the ability to penetrate into a human body especially if making contact with areas like the face [or] eyes." He explained that a pellet is "essentially . . . a small bullet, just not fired with gunpowder." In the deputy's opinion, for safety reasons, an air rifle should never be pointed at another person. The deputy admitted that he did not find any air rifle pellets in defendant's vehicle.

The deputy also testified that individuals who train with paintball guns typically wear protective gear to protect sensitive areas from being hit by projectiles and that, absent such protective gear, a significant injury could occur if a person is hit by a paintball fired from a paintball gun.

6

4. <u>Testimony of Guests Staying in the Main House on the Property</u>

A guest staying in the main house located on the property testified that when he returned to the house in the evening of May 11, 2021, he observed that a window in the door of the house had been broken and also observed that "rocks or something else" were "in the living room window." A second guest testified that upon returning to the main house located on the property, he observed that "a couple of the windows looked like somebody either shot them or [had] thrown a rock through them."

C. *Verdict and Sentence*

The jury convicted defendant on all counts. Defendant was sentenced to an aggregate term of eight years in state prison, comprised of the upper term of six years for the burglary (count 1; § 459); a consecutive one-year term, representing one-third the middle term, for each conviction for assault with a deadly weapon (counts 2, 3; § 245, subd. (a)(1)); and a concurrent term of 324 days for assaulting a police animal (count 4, § 600, subd. (a)).

## III. DISCUSSION

A. *Sufficient Evidence Supports Defendant's Convictions on Counts 2 and 3*

The first contention raised by defendant on appeal is that there was insufficient evidence to support his convictions for assault with a deadly weapon (counts 2, 3; § 245, subd. (a)(1)). With respect to this issue, defendant challenges only the sufficiency of the evidence to support a finding that he had the present ability to inflict injury on D.L. and K.S. We disagree.

7

1. General Legal Principles and Standard of Review

Section 245, subdivision (a)(1) "makes it a crime to 'commit[] an assault upon the person of another with a deadly weapon or instrument other than a firearm.' " (*People v. Aguayo* (2022) 13 Cal.5th 974, 983; *In re D.T.* (2015) 237 Cal.App.4th 693, 698; § 245, subd. (a)(1).) The crime "has two components: '(1) the assault, and (2) the means by which the assault is committed.' " (*In re Raymundo M.* (2020) 52 Cal.App.5th 78, 85.) One element necessary to prove an assault is that the defendant have "a present ability" to "commit a violent injury on the person of another." (*Ibid.*)

" ' "When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citation.] We determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." [Citation.] In so doing, a reviewing court "presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." ' " (*People v. Dalton* (2019) 7 Cal.5th 166, 243-244.)

2. Application

Here, defendant argues that the evidence was insufficient to support a finding that he had the present ability to inflict injury on D.L. and K.S. because (1) the evidence did

8

not establish defendant was wielding an air rifle as opposed to a paintball gun,[5] and (2) even if he was wielding an air rifle at the time of his encounter with D.L. and K.S., there was no evidence the air rifle was loaded with pellets.

With respect to the first argument, even if we were inclined to agree with defendant's implied assertion that a paintball gun cannot be considered a deadly weapon,[6] the evidence was clearly sufficient to support a finding that defendant was wielding an air rifle at the time he encountered D.L. and K.S. When asked to identify photographs that depicted the object held by defendant during the incident, both D.L. and K.S. identified photographs depicting the air rifles recovered from defendant's vehicle and not the photograph of defendant's paintball gun. This was substantial evidence upon

_____

[5] While his argument is not entirely clear, defendant appears to concede that an air rifle can be considered a deadly weapon for purposes of section 245, subdivision (a)(1). Even if defendant intended to challenge the sufficiency of the evidence to establish this point, we would conclude substantial evidence in the record supports a finding that an air rifle qualifies as a deadly weapon under the statute. "In the context of this statutory provision, a ' "deadly weapon" ' is ' "any object, instrument, or weapon which is used in such a manner as to be capable of producing and likely to produce, death or great bodily injury." ' " (*In re D.T.*, *supra*, 237 Cal.App.4th at p. 698; *In re Raymundo M.*, *supra*, 52 Cal.App.5th at pp. 85-86.) "When deciding whether an object that is not inherently deadly is nonetheless likely to produce great bodily injury or death, 'the trier of fact may consider the nature of the object, the manner in which it is used, and all other facts relevant to the issue." (*In re D.T.*, at p. 699.) As the People correctly note, a sheriff's deputy testified that a pellet fired from an air rifle can inflict great bodily injury.

[6] As the People point out, a sheriff's deputy testified that a paintball gun can cause significant injuries if fired at an individual who is not wearing appropriate protective gear that is typically worn in conjunction with the use of a paintball gun. Defendant has ignored this evidence in his appellate briefs, even after the People identified the testimony in the respondent's brief.

which the jury could rely to conclude that defendant was wielding an air rifle and not a paintball gun at the time he encountered the victims.

The fact that the defendant's paintball gun also had some of the physical features of the gun described by K.L. and D.S. is not relevant to our analysis. On appeal, a "defendant does not defeat the sufficiency of the evidence merely by offering 'competing inferences he wishes the jury had drawn' " (*People v. Disa* (2016) 1 Cal.App.5th 654, 667, fn. 9), and "[t]he existence of possible exculpatory explanations, whether they are simply suggestions not excluded by the evidence or even where they could be reasonably deduced from the evidence" does not warrant rejection of the determination made by the trier of fact" (*People v. Redrick* (1961) 55 Cal.2d 282, 290; see *People v. Abilez* (2007) 41 Cal.4th 472, 504 [" ' "[T]he opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment." ' "]). D.L. and K.S.'s identification of photographs depicting defendant's air rifles supports a reasonable inference that defendant held an air rifle as opposed to a paintball gun at the time of the incident, and reversal is not warranted on this basis.

With respect to defendant's second argument, we also conclude substantial evidence in the record supports a reasonable inference that his air rifle was loaded. While it is true that a sheriff's deputy testified that no pellets were recovered with defendant's air rifles, this was not the only evidence presented for the jury's consideration. As the People correctly note, "[a] defendant's own words and conduct in the course of an offense may support a rational fact finder's determination that he used a loaded weapon." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 12-13.) Thus, the testimony by K.S. and D.L.

that defendant pointed the gun at each of them and ordered them to the ground, as well as K.S.'s testimony that defendant's "erratic behavior" led K.S. to believe defendant was going to shoot him, constitutes circumstantial evidence suggesting the air rifle was loaded.

More importantly, both D.L. and K.S. testified that they heard a series of banging noises that could have been consistent with shots from the air rifle when defendant left them to approach the main house on the property. While D.L. and K.S. could not definitively identify the noise as shots from an air rifle,[7] two of the guests who had been staying in the main house testified that upon their return to the house, they witnessed damage to the windows that could have been consistent with the windows being shot.[8] Collectively, this testimony would support a reasonable inference that defendant used his air rifle to shoot at the windows in the main house moments after his encounter with D.L. and K.S. Thus, the jury could reasonably infer that the air rifle defendant held was loaded such that defendant had the present ability to inflict injury at the time he encountered D.L. and K.S. It is now clear that there need not be direct evidence that a firearm was loaded in order for a trier of fact to conclude that it was loaded. The reviewing court will look at all the facts and circumstances related to the use of the

---

[7] D.L. described the noise as "a lot of bang[ing]. And I just didn't know if it was from the gun or just smashing—or pushing up against something, but it was several times." K.S. described the noise as a series of "tapping" noises, followed by glass shattering.

[8] One guest described the window as showing signs of being hit with small rocks or other debris, while the other guest described the broken window as having been "shot."

11

firearm in order to determine whether substantial evidence supports the jury's conclusion that a firearm was loaded. "A defendant's own words and conduct in the course of an offense may support a rational fact finder's determination that he used a loaded weapon." (*People v. Rodriguez, supra*, 20 Cal.4th at p.13; see *People v. Montgomery* (1911) 15 Cal.App. 315, 317-319.)

Because we conclude that the record contains substantial evidence upon which the jury could rely to find that defendant had the present ability to inflict great bodily injury at the time he encountered D.L. and K.S., we decline to reverse these convictions on the basis of insufficient evidence.

B. *Defendant Forfeited His Claim of Instructional Error*

Defendant also claims the trial court erred when responding to a question from the jury. We conclude that defendant's claim of error has been forfeited and that, even in the absence of forfeiture, defendant has not established an abuse of discretion warranting reversal.

Section 1138 provides that after a jury retires for deliberation, they may request "to be informed on any point of law arising in the case" and "the information required must be given." (§ 1138.) " 'The Supreme Court has held that [section 1138] imposes on the trial court a mandatory 'duty to clear up any instructional confusion expressed by the jury.' " (*People v. Lua* (2017) 10 Cal.App.5th 1004, 1016.) However, " ' "[t]his does not mean the court must always elaborate on the standard instructions. Where the original instructions are themselves full and complete, the court has discretion under . . . section 1138 to determine what additional explanations are sufficient to satisfy the jury's request

12

for information." [Citation.] We review for an abuse of discretion any error under . . . section 1138.' " (*Lua*, at p. 1016.)

As relevant to this claim, the trial court instructed the jury with standard jury instructions regarding the charges of assault with a deadly weapon, which included the following definition: "A deadly weapon other than a firearm is any object, instrument, or weapon that is used in such a way that it is capable of causing and likely to cause death or great bodily injury. [¶] In deciding whether an object is a deadly weapon, consider all the surrounding circumstances." While deliberating, the jury requested the trial court provide a definition of " 'deadly weapon' " pursuant to " 'Ca[lifornia] code or law.' " The trial court conferred with counsel and indicated that it intended to respond by instructing the jury to refer to the specific number and page of the standard instruction setting forth the definition that had already been given. Counsel for defendant responded to this proposal, "Yeah," and the prosecutor responded, "That's what we were saying."

Given the above record, we must conclude that defendant's claim of error on this point has been forfeited. As explained by the California Supreme Court, "counsel's affirmative agreement with the court's reply to a note from the jury forfeits a claim of error." (*People v. Salazar* (2016) 63 Cal.4th 214, 248.) This is because counsel's "endorsement of the court's proposal effectively foreclose[s] further exploration of possible responses to the jury's question." (*Id.* at pp. 248-249.) Thus, because counsel did not object and instead agreed with the trial court's proposed response to the jury's question, any claim that the trial court's responses was erroneous has been forfeited.

13

Additionally, even in the absence of forfeiture, we see no basis to conclude the trial court abused its discretion in responding to the jury's question. The juror question in this case reads: "We would like to know the definition of 'Deadly Weapon' per Ca[lifornia] code or law." Contrary to defendant's suggestion on appeal, the question does not suggest the jury was confused by the manner in which the phrase " 'deadly weapon' " was defined. An equally reasonable interpretation of this question is that some jurors may have overlooked the fact that the definition of " 'deadly weapon' " had already been provided in the standard instructions. The fact that the trial court and all counsel agreed that the most appropriate response was to direct the jury to the instruction number and page where the definition could be located strongly suggests that, at the time, all parties adopted this interpretation of the jury's question. Notably, the record does not show the jury responded with any further questions once directed to the standard instructions where the definition of " 'deadly weapon' " could be located.

In our view, the trial court adopted a reasonable interpretation of the jury's question and responded accordingly. At the very least, we cannot conclude that the trial court acted in an arbitrary or capricious manner constituting an abuse of discretion by referring the jury to a standard instruction that had already been given. (See *People v. Lua*, *supra*, 10 Cal.App.5th at p. 1017 ["[T]he trial court does not abuse its discretion when it determines the best way to aid the jury is by directing the jury to reread the applicable jury instructions that 'are themselves full and complete,' " especially when "the defendant has not claimed" that those instructions are "incomplete or incorrect."].)

14

Thus, even in the absence of forfeiture, we would find no abuse of discretion warranting reversal on this ground.

C. *Any Error Under Section 1170 Was Harmless*

Finally, defendant contends that we must reverse his sentence and remand the matter for resentencing as the result of amendments to section 1170 made by Senate Bill No. 567. We conclude that any error in failing to apply the provisions of section 1170 as amended by Senate Bill No. 567 was harmless under the circumstances. Thus, defendant has failed to establish prejudice warranting reversal of his sentence or remand for resentencing.

1. Relevant Background

In this case, the trial court reviewed a probation report that recommended defendant be sentenced to an upper term of six years in state prison for burglary (count 1; § 459) and sentenced to concurrent terms for the remaining convictions. The probation report listed numerous factors in aggravation that could support the imposition of the upper term on count 1 and listed no factors in mitigation. As part of this analysis, the probation report detailed that defendant had suffered six prior adult convictions, which included convictions for inflicting corporal injury on a spouse or cohabitant (Pen. Code, § 273.5, subd. (a)); evading a peace officer (Veh. Code, § 2800.2); possession of a controlled substance (Health & Saf. Code, § 11377, subd. (a)); providing false identification to a peace officer (Pen. Code, § 148.9, subd. (a)); and battery (Pen. Code, § 242). The probation report also detailed two prior juvenile adjudications for receiving stolen property and second degree burglary.

15

The trial court declined to adopt the recommendations of the probation report and instead imposed the upper term of six years for the burglary conviction (count 1), as well as consecutive sentences of one year, representing one-third the middle term, for each of defendant's convictions for assault with a deadly weapon (counts 2, 3). It imposed a sentence of 324 days in county jail for assaulting a police animal (count 4) but concluded that this sentence should be deemed served based upon credit for time actually served and conduct credits.

The trial court provided an extensive statement of reasons for its discretionary sentencing choices. Initially, the trial court commented that it was "looking at the defendant's history"; observed that defendant's history of prior convictions appeared to be "escalating in the level of violence" and that this was not the first time defendant was convicted of attempting to evade law enforcement; and expressed the opinion that defendant's current offenses appeared to be an escalation compared to his prior convictions. Following these comments, the trial court stated: "Certainly probation [is] not in the realm of possibility here, nor is the low term, nor is the midterm."

The trial court then made the following statements:

"The question is only as to the aggravated term, whether the court is going to impose consecutive time rather than concurrent time. And given his level of criminal experience and the level of violence that was committed that night of placing those two gentlemen at gunpoint on the ground, I don't see how this court could just essentially say that those crimes, other than the conviction, don't merit any time in custody. . . . [¶]

16

I reject that he was acting impulsively. He dressed in a manner that allowed him to move quietly and swiftly undetected. He came prepared with what were determined to be deadly weapons by the jury. . . . He used those deadly weapons to keep those individuals on the ground while he conducted his burglary of the other property. I just don't see this as meriting concurrent time when you have separate victims. And separate victims being held in that fashion on the ground with what appeared to be and determined by our jury as deadly weapons in the manner that they were used. And so I am not going to be granting concurrent time. . . . [¶] . . . [¶]

And then in terms of concurrent or consecutive sentences, the court is finding that the crimes did involve separate acts of violence because there were multiple parties affected. He pointed the gun, the firearms, the deadly weapons at more than just one individual . . . [and] he was found guilty by the jurors as to the two separate assaults with deadly weapons. [¶] So under [California Rules of Court,] rule 4.424, the court is also finding that the crimes and their objectives were independent of one another. [¶] The court is finding a circumstance in aggravation under sub (b), sub (1) that the defendant was on a grant of post release community supervision at the time that he committed this new offense."

2. General Legal Principles

Effective January 1, 2022, Senate Bill No. 567 (2021-2022 Reg. Sess.) amended section 1170, subdivision (b), which guides the trial court's discretion in sentencing a defendant when the applicable statutes specify three possible terms for the imposition of a judgment of imprisonment. (Stats. 2021, ch. 731, § 1.) As amended, section 1170,

17

subdivision (b), now provides the middle term of imprisonment as the presumptive sentence and permits a trial court to "impose an upper term sentence only where there are aggravating circumstances in the crime and the defendant has either stipulated to the facts underlying those circumstances or they have been found true beyond a reasonable doubt." (*People v. Flores* (2022) 75 Cal.App.5th 495, 500 (*Flores*); see § 1170, subd. (b)(2).) Under the amended statute, the truth of any facts used to support an aggravating circumstance must be tried in a bifurcated proceeding, except where the evidence is also relevant to prove or defend against a charged offense or enhancement. (§ 1170, subd. (b)(2); Stats. 2021, ch. 731, § 1.) However, the statute also contains an exception that permits the trial court to consider a defendant's prior convictions based upon a certified record of conviction to find a circumstance in aggravation without submission of this fact to a jury. (§ 1170, subd. (b)(3).)

These amendments to section 1170 made by Senate Bill No. 567 apply retroactively to all cases not yet final because they have the potential to lessen the punishment for a defendant's crimes. (*Flores*, *supra*, 75 Cal.App.5th at p. 500; *People v. Garcia* (2018) 28 Cal.App.5th 961, 972-973; *In re Estrada* (1965) 63 Cal.2d 740, 744-745.) Published California appellate decisions that have considered the retroactive application of the current version of section 1170, subdivision (b), appear to uniformly recognize that the failure to comply with the statute's requirements does not require reversal per se but can be found harmless. However, they differ significantly on the correct test to apply to determine whether any error was harmless.

18

In *Flores*, *supra*, 75 Cal.App.5th 495 and *People v. Salazar* (2022) 80 Cal.App.5th 453 (*Salazar*), review granted October 12, 2022, S275788, the courts of appeal concluded that, " '[i]f a reviewing court concludes, beyond a reasonable doubt, that the jury, applying the beyond-a-reasonable-doubt standard, unquestionably would have found true at least a single aggravating circumstance had it been submitted to the jury,' the error is harmless." (*Flores*, at p. 500; *Salazar*, at p. 465 ["*Flores* is the standard governing appellate review."].)

In *People v. Lopez* (2022) 78 Cal.App.5th 459 (*Lopez*) and *People v. Wandrey* (2022) 80 Cal.App.5th 962 (*Wandrey*), review granted September 28, 2022, S275942, the courts of appeal concluded that the standard articulated in *Flores* was incomplete and instead, any error cannot be deemed harmless unless a reviewing court can conclude beyond a reasonable doubt that (1) a jury would have unquestionably found true beyond a reasonable doubt each of the aggravating factors upon which the trial court relied at the time of sentencing, or (2) it is not reasonably probable that the trial court would have reached a result more favorable to defendant if the trial court was required to rely only on those aggravating factors that the reviewing court can conclude would have unquestionably been found true by a jury beyond a reasonable doubt (*Lopez*, at pp. 463, 466-467; *Wandrey*, at p. 982).

In *People v. Zabelle* (2022) 80 Cal.App.5th 1098 (*Zabelle*) and *People v. Dunn* (2022) 81 Cal.App.5th 394 (*Dunn*), review granted October 12, 2022, S275655, the courts of appeal articulated yet a third standard, holding that in order to find error harmless, a reviewing court must (1) conclude beyond a reasonable doubt that a jury

would have unquestionably found true at least one aggravating factor beyond a reasonable doubt; (2) determine whether it is reasonably probable that a jury would have found true any remaining aggravating factors relied upon by the trial court to impose an upper term sentence; and (3) conclude that it is reasonably probable the trial court would not have exercised its discretion differently had it considered only the aggravating factors the jury would have unquestionably found true beyond a reasonable doubt and those factors that the reviewing court finds reasonably probable that the jury would have found true (*Zabelle*, at p. 1112-1113; *Dunn*, at pp. 409-410).

In this case, we need not resolve the split in authority regarding the appropriate harmless error test because, as we explain, the nature of the alleged error in this case would be deemed harmless under all three tests.

3. The Trial Court Relied on a Single Aggravating Factor To Impose the Upper Term Sentence on Count 1

Initially, we must discern the aggravating factors upon which the trial court relied to impose the upper term sentence on count 1. Defendant contends the trial court relied on the fact that defendant had postrelease community service (PRCS) status at the time he committed the current offenses as the sole aggravating factor in support of imposing the upper term sentence. In contrast, the People argue that the trial court relied on multiple aggravating factors, including the fact that defendant had numerous prior convictions of increasing severity, that defendant engaged in violent conduct with respect to the current offenses, and defendant's PRCS status at the time he committed the current offenses. We respectfully disagree with both parties' characterizations of the record.

20

In our view, the trial court referred to aggravating circumstances for two, distinct purposes: (1) imposing the upper term sentence on count 1, and (2) imposing consecutive sentences on counts 2 and 3. This distinction is apparent when the trial court's comments are reviewed in their entirety in context. Once this distinction is recognized, it is clear that the trial court relied on a single aggravating factor to impose the upper term sentence on count 1: the fact that defendant had numerous prior convictions of increasing severity. (Cal. Rules of Court, rule 4.421(b)(2)).[9]

First, the trial court began its statement of reasons for its discretionary sentencing choices by stating that it was "looking at the defendant's history," observing that defendant's history of prior convictions appeared to be numerous and escalating in seriousness, and further observing that the current offenses appeared to be an escalation from defendant's prior convictions. After these comments, the trial court made clear it would impose an upper term sentence on count 1, stating: "Certainly, probation's not in the realm of possibility here, nor is the low term, nor is the midterm." The trial court made no further comments regarding the imposition of an upper, middle, or lower term sentence during the course of the hearing. Thus, it is clear that the trial court relied on the number and increasing severity of defendant's prior convictions as the basis for imposing the upper term sentence on count 1.

Second, following the trial court's initial reference to defendant's criminal history, the trial court made repeated, explicit statements indicating that the remainder of its

---

[9] Further references to rules are to the California Rules of Court.

21

colloquy addressed the issue of imposing consecutive sentences on counts 2 and 3. Immediately after stating that the low and middle terms were not appropriate, the trial court pivoted to the issue of consecutive sentences, stating: "The question is only as to the aggravated term, whether the court is going to impose consecutive time rather than concurrent time." It was in this context that the trial court observed that (1) the manner in which defendant carried out his crimes indicated planning (Rule 4.421(a)(8); (2) defendant's current offenses involved violence (Rules 4.421(a)(1), 4.425(a)(2)); (3) defendant was armed with a weapon during the commission of the current offenses (Rule 4.421(a)(2)); (4) defendant's two assaults were predominantly independent of each other (Rule 4.425(a)(1)); and (5) defendant was on PRCS at the time he committed the current offenses (Rule 4.421(b)(4)). During this colloquy, the trial court made multiple, express statements that indicated it remained on the topic of consecutive sentences, including: "I don't see how this court could just essentially say that those crimes . . . don't merit any time in custody";[10] "I just don't see this as meriting concurrent time"; "so I am not going to be granting concurrent time"; and "in terms of concurrent or consecutive sentences." In making this assessment, the court cited Rule 4.425 which is the rule dealing specifically with concurrent versus consecutive sentences. Thus, the most reasonable interpretation of the trial court's statements is that its reference to aggravating factors

---

[10] The comment regarding not meriting any time in custody could only refer to the imposition of a concurrent sentence. It could not have been in reference to the imposition of an upper term because, under the determinate sentencing scheme, even imposition of the lower term would result in the imposition of a prison sentence.

22

other than defendant's criminal history were made in support of its decision to impose consecutive sentences on counts 2 and 3.

Third, while the trial court briefly mentioned the violent nature of the assaults when initially referencing defendant's criminal history,[11] it is not reasonable to interpret that comment as reliance on the fact that the crime involved great violence (Rule 4.421(a)(1)) as an aggravating factor to impose the upper term on count 1. Rule 4.421(a)(1) is a factor "relating to the crime." It is well established that, "in selecting the base term for a substantive offense, . . . the trial court can use facts under [Rule 4.421(a)] only if they relate to that offense." (*People v. Garcia* (1995) 32 Cal.App.4th 1756, 1779; *People v. Price* (1984) 151 Cal.App.3d 803, 812 ["[T]he aggravating fact must be reasonably related to the sentence choice on each count where it is employed."].) Thus, a trial court may not use "facts from other counts to aggravate a defendant's sentence for a different count." (*People v. Searle* (1989) 213 Cal.App.3d 1091, 1098; *People v. Harvey* (1979) 25 Cal.3d 754, 758 [The rule pertaining to " 'facts relating to the crime' " "plainly applies only to those aggravating circumstances which underlie the offense . . . for which sentence is imposed . . . ."].) Because it would have been impermissible for the trial court to rely on facts related to the commission of the assaults (counts 2, 3) for the purpose of imposing the upper term for commission of the burglary (count 1), we decline to interpret the trial court's comments in this manner.

---

[11] Specifically, the trial court stated: "And now the defendant not only burglarized a residence . . . , but he also placed two other individuals on the ground near that property at gunpoint . . . ."

Nor is it reasonable to interpret the trial court's brief comment regarding holding the victims at gunpoint as an indication that the trial court relied on the fact defendant engaged in violent conduct that indicates a serious danger to society (Rule 4.421(b)(1)) as an aggravating factor to impose the upper term sentence on count 1. The trial court repeatedly and explicitly referenced the violent nature of the assaults as a basis for justifying imposition of consecutive sentences on counts 2 and 3.[12] Because the trial court specifically referenced this fact as a basis for imposing consecutive sentences on counts 2 and 3, we presume that the same fact was not used as a basis to impose an upper term on count 1. (*People v. Reeder* (1984) 152 Cal.App.3d 900, 919 [same fact may not be used as an aggravating circumstance to impose the upper term on one count and then a consecutive sentence on a different count]; *People v. Calhoun* (2007) 40 Cal.4th 398, 408 [A trial court may rely on a fact to impose "either the upper term or a consecutive sentence, although it cannot do both."].) In our view, the most reasonable interpretation of the trial court's brief comment regarding violence when stating its reason for imposing the upper term on count 1 is that the comment was intended to highlight the increasing

---

[12] The trial court made this reference on at least three occasions when discussing the imposition of consecutive sentences, stating: "And given . . . the level of violence that was committed that night of placing those two gentlemen at gunpoint on the ground, I don't see how this court could just essentially say that those crimes . . . don't merit any time in custody." The trial court later stated: "And separate victims being held in that fashion on the ground with what appeared to be and determined by our jury as deadly weapons in the manner that they were used. And so I am not going to be granting concurrent time." Finally, the trial court repeated this observation by stating: "And then in terms of concurrent or consecutive sentences, the court is finding that the crimes did involve separate acts of violence . . . . "

severity of defendant's numerous convictions. (Rule 4.421(b)(2)). Indeed, the fact the trial court prefaced its reference to defendant's current offenses with the phrase "and now" strongly suggests it was doing so to compare the nature of defendant's prior convictions to the current offenses.

Fourth, the fact that some of the factors referenced by the trial court are listed in Rule 4.421 as aggravating factors that could be relied upon to impose an upper term sentence does not suggest these facts were relied upon by the trial court for this purpose. Under Rule 4.425(b), "[a]ny circumstances in aggravation or mitigation, whether or not the factors have been stipulated to by defendant or found true beyond a reasonable doubt at trial . . . , may be considered in deciding whether to impose consecutive rather than concurrent sentences . . . ." Thus, mere reference to the factors listed in Rule 4.421 does not, by itself, suggest the trial court relied on these factors for the purpose of imposing the upper term sentence on count 1.

Finally, we respectfully disagree with both parties' interpretation of the record with respect to the trial court's reference to defendant's PRCS status. In full, the trial court's statement on this point reads: "The court is finding a circumstance in aggravation under sub (b), sub (1) that the defendant was on a grant of post release community supervision at the time that he committed this new offense." Immediately preceding this comment, the trial court found that the crimes and their objectives involved separate acts of violence and were independent of one another "under Rule 4.425." Thus, it is apparent that this portion of the trial court's colloquy involved consideration of the "factors affecting concurrent or consecutive sentences." (Rule 4.425.) In our view, the trial

25

court's reference to "sub (b), sub (1)" is the key to understanding its reference to defendant's PRCS status. Rule 4.425(b)(1) precludes the dual use of a fact to impose the upper term and a consecutive sentence. (Rule 4.425(b)(1).) Thus, in context, the trial court's reference to "sub (b), sub (1)" seemingly intended to make clear that it was not relying on defendant's PRCS status to impose the upper term on count 1 but instead relying upon this fact to impose consecutive sentences on counts 2 and 3. A contrary interpretation would make no sense. If the trial court intended to rely on defendant's PRCS status to impose the upper term on count 1, the appropriate reference would have been to Rule 4.421(b)(4), and there would have been no need to make any findings pursuant to "sub (b), sub (1)" of Rule 4.425, or reference that provision for any purpose.

Thus, in context, the trial court's statement of reasons makes clear that its decision to sentence defendant to the upper term on count 1 was based upon a single aggravating factor:[13] that defendant's prior convictions were numerous and of increasing seriousness. (Rule 4.421(b)(2).) We proceed to analyze whether the retroactive application of section 1170, subdivision (b), in its current form suggests prejudicial error entitling defendant to reversal of his sentence.

---

[13] At the time of sentencing, the trial court was entitled to rely on a single aggravating factor to impose an upper term sentence (*People v. Black* (2007) 41 Cal.4th 799, 815 ["[T]he presence of one aggravating circumstance renders it lawful for the trial court to impose an upper term sentence."]), and the scope of the trial court's discretion in this regard has not changed (*People v. Lopez* (2022) 78 Cal.App.5th 459, 467 ["[U]nquestionably the trial court may still rely on any single permissible aggravating factors to select an upper term sentence under the newly revised triad system."]). Notably, defendant contends the trial court relied on a single aggravating circumstance to impose the upper term sentence in this case, but he does not argue that reliance on a single factor constituted an abuse of discretion under the circumstances of this case.

26

4. Any Error Was Not Prejudicial

The number and types of prior convictions that defendant suffered is a fact that can be determined solely from a record of conviction. (*People v. Towne* (2008) 44 Cal.4th 63, 81-82) Thus, the aggravating circumstance upon which the trial court relied to impose the upper term in this case could have been established based upon a certified record of conviction, and defendant would not have been entitled to a jury determination regarding the fact of his prior convictions, even under the current version of section 1170, subdivision (b). (§ 1170, subd. (b)(3); Stats. 2022, ch. 744, § 1.) Nevertheless, we acknowledge that the trial court relied upon the facts set forth in a probation report instead of a certified record of conviction in this case. The failure to rely upon a certified record of conviction to establish the truth of defendant's prior convictions constitutes error under section 1170, subdivision (b)(3). However, as we explain, any such error was harmless in this case.

Under all three of the harmless error tests articulated by the Court of Appeal, the threshold question is whether the reviewing court can conclude beyond a reasonable doubt that any of the aggravating factors relied upon by the trial court to impose the upper term sentence would have unquestionably been found true beyond a reasonable doubt. (*Flores*, *supra*, 75 Cal.App.5th at p. 500; *Lopez*, *supra*, 78 Cal.App.5th at p. 463; *Zabelle*, *supra*, 80 Cal.App.5th at pp. 1112-1113.) We have no hesitation concluding that the fact of defendant's prior convictions would have unquestionably been found true if the prosecution were required to prove the truth of those convictions in a statutorily permissible manner under section 1170, subdivision (b).

27

Contrary to defendant's suggestion in reply, this is not a case in which the record fails to directly address the aggravating circumstance at issue. Instead, the probation report expressly relied upon the fact of defendant's prior convictions in order to recommend an increased sentence. Thus, even under the law as it stood at the time, defendant had every incentive to dispute the fact of his prior convictions or correct any inaccuracies contained in the probation report on this point to the extent that he could. Further, we observe that prior to trial, the People moved to introduce evidence of at least three of defendant's prior convictions for impeachment purposes, and defendant again did not challenge the fact of these convictions in opposition to the motion.

On appeal, defendant has not suggested that, if the procedures now required under section 1170, subdivision (b)(3), had been in place, the People would have been unable to produce a certified record of his prior convictions to prove the fact he suffered the identified convictions. Nor has defendant suggested what additional evidence could have been offered to contest the fact of his prior convictions such that a trier of fact could have possibly reached a different conclusion.[14] Under the circumstances, we conclude that the fact of defendant's prior convictions would unquestionably have been found true beyond

---

[14] As our Supreme Court has explained, " '[o]fficial government records clearly describing a prior conviction presumptively establish that the conviction in fact occurred . . . . Some evidence must rebut this presumption before the authenticity, accuracy, or sufficiency of the prior conviction records can be called into question.' " (*People v. Delgado* (2008) 43 Cal.4th 1059, 1066; see *People v. Yim* (2007) 152 Cal.App.4th 366, 371 [Court records pertaining to a prior conviction were sufficient to "demonstrate, as a matter of law, that [the defendant] committed new offenses while on parole," and "[n]o trial court or jury could rationally find otherwise."].)

a reasonable doubt. (*People v. French* (2008) 43 Cal.4th 36, 53 [The failure to submit a sentencing factor to a jury may be found harmless beyond a reasonable doubt if the evidence supporting that factor was uncontested, and "there is no 'evidence that could rationally lead to a contrary finding.' "]; *Neder v. United States* (1999) 527 U.S. 1, 19.)

Because we conclude that the fact of defendant's numerous prior convictions would unquestionably have been found true even if the provisions of section 1170, subdivision (b), are retroactively applied to defendant's case, any error would be considered harmless under *Flores*, which requires only that we conclude one aggravating circumstance relied upon by the trial court would have unquestionably been found true beyond a reasonable doubt. (*Flores*, *supra*, 75 Cal.App.5th at p. 500.)

Additionally, because we conclude that the trial court relied on only one factor to impose the upper term sentence on count 1, application of the alternative harmless error tests articulated in *Lopez* and *Zabelle* would result in the same conclusion. Under *Lopez*, if "the reviewing court can conclude beyond a reasonable doubt that a jury would have found true beyond a reasonable doubt *all* of the aggravating factors on which the trial court relied," then "the defendant has not suffered prejudice" and there is no need to consider the second prong of the test. (*Lopez*, *supra*, 78 Cal.App.5th at p. 467, fn. 11.) Likewise, under *Zabelle*, "it [is] not reasonably probable that the trial court would have chosen a lesser sentence had it fully complied with section 1170's requirements," where " 'a jury would have found true beyond a reasonable doubt *all* of the aggravating factors on which the trial court relied.' " (*Zabelle*, *supra*, 80 Cal.App.5th at p. 1113.)

Where the trial court relies on only one circumstance in aggravation, the conclusion that this circumstance would unquestionably be found true beyond a reasonable doubt satisfies all three harmless error tests currently articulated by the Court of Appeal. Because any error in this case would be deemed harmless regardless of which test we employ, we conclude that defendant has not shown prejudice warranting reversal of his sentence.

## IV. DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

FIELDS
J.

We concur:

CODRINGTON
Acting P. J.

RAPHAEL
J.